STATE OF NORTH CAROLINA v. RICHARD LEVI JENKINS

No. 52

(Filed 15 July 1980)

**1. Criminal Law § 29— mental capacity to proceed—ability of defendant to assist in defense**

Testimony by a psychiatrist that defendant could assist in his defense was tantamount to a statement that defendant could assist in his defense in a rational and reasonable manner, and such testimony was sufficient to support the trial court's conclusion that defendant could assist in his defense in a rational and reasonable manner.

**2. Criminal Law § 29— mental capacity to proceed—cooperation with counsel—specific finding not required**

In determining defendant's mental capacity to proceed, the trial judge was not required to make a specific finding that defendant was able to cooperate with his counsel to the end that any available defense could be interposed. G.S. 15A-1001(a).

**3. Criminal Law § 75.14— defendant with low IQ—right to counsel—effectiveness of waiver**

Evidence was sufficient to support the trial court's findings of fact and conclusions of law that defendant knowingly and intelligently waived his right to counsel, though such evidence tended to show that defendant had a low IQ and impaired memory, since the evidence tended to show that defendant's rights were slowly read to him and defendant stated that he understood each right as it was explained to him.

**4. Homicide § 20.1; Criminal Law § 43.1— photographs of deceased and defendant—admissibility for illustration**

The trial court in a murder prosecution did not err in admitting photographs of the victim's body taken at the scene of the crime, since the photographs were fair and accurate representations of the body of the victim and thus were admissible to illustrate the testimony of witnesses; they were material and relevant as tending to show malice on the part of defendant; and they were admissible to corroborate defendant's statement as to how blood came to be on his shirt. Furthermore, a photograph of defendant was admissible to illustrate a witness's testimony that defendant had a reddish tint to his hair on the date of the crime while his hair was darker at trial.

**5. Criminal Law § 81— SBI lab report—authentication**

There was no merit to defendant's contention that the trial judge erred in admitting an SBI laboratory report, since the report was an original document, and its authenticity was proved by the custodian of the records kept in the latent evidence section of the SBI laboratory.

6. **Criminal Law § 101— defense witness taken into custody—jury not present—defendant not prejudiced**

Defendant failed to show that he was prejudiced by the court's failure to take some action when a defense witness was taken into custody by a deputy sheriff after the witness had testified, since defendant did not lodge an objection to this occurrence at trial or move for a mistrial, and since the action complained of occurred outside the presence of the jury.

7. **Criminal Law § 102.5— defendant's statement called confession by district attorney—defendant not prejudiced**

Though a statement made by defendant might have been more appropriately called an inculpatory statement and it might have been the better practice for the trial court to instruct the jury to disregard the district attorney's use of the word "confession" in referring to the statement, defendant was not prejudiced since the questions to which objections were sustained did not place before the jury any incompetent or otherwise inadmissible evidence, and it was improbable that the district attorney's improper characterization of defendant's statement might have affected the outcome of the case.

8. **Homicide § 21.7— second degree murder—sufficiency of evidence**

Evidence was sufficient to sustain defendant's conviction of second degree murder where it tended to show that defendant and deceased left a bar and rode in a taxi to a little road which led through some woods into a grassy field; according to defendant's statement to police officers, he and deceased went into the woods, started drinking, and had sexual intercourse; defendant went to sleep and when he awoke, deceased was not breathing and her heart was not beating; defendant had put his hands on deceased's neck but did not remember squeezing; defendant went to the bus station, but then took a taxi back to the crime scene to see if deceased was dead; when defendant returned to the taxi, he had blood on his shirt; defendant returned to the bus station and took a bus to a city out of the State, returning to N. C. the next day; and defendant admitted to a friend that on the day he met deceased, he was drinking "pretty bad," that he thought he had killed her, that he grabbed her by the neck, and that she was dead when he left her.

Justice BROCK did not participate in the consideration or decision of this case.

APPEAL by defendant from *Mills, J.,* 30 July 1979 Session of BUNCOMBE Superior Court.

Defendant was charged in an indictment proper in form with the murder of Mary F. Burdette. His attorney filed a motion questioning defendant's capacity to proceed pursuant to G.S. 15A-1002, and a hearing was held on the motion prior to the selection of the jury.

At trial the State presented evidence tending to show that on 11 October 1978 the nude body of the deceased was found in a

grassy clearing off Broadway Street in Asheville. The body was in an advanced stage of decomposition, but a pathological examination indicated that the deceased had received a tremendous blow or blows to the head and neck area and died from the resulting injury. Defendant made a statement to Detectives Anarino and Medford of the Asheville Police Department tending to show that on 4 October 1978 he encountered Mary Burdette in the B & R Bar in Asheville. They left in a taxicab and went to a grassy field where they drank gin and engaged in sexual intercourse. Defendant stated that he then went to sleep, and when he awakened Mary Burdette was dead. He thought he had killed her and remembered putting his hands around her neck but did not remember squeezing.

The testimony of several of the State's witnesses corroborated defendant's statement to the police.

Defendant presented evidence tending to show that shortly past 2:30 p.m. on 4 October 1978, the deceased was seen drunk with two men on Lexington Avenue. Ms. Molly T. Buckner testified for defendant that she was driving on Broadway between 6:00 and 7:00 on the evening of 4 October 1978 when she saw Jack Luther, the deceased's boyfriend, with the deceased. Both appeared to be intoxicated, and Luther was in the process of dragging the deceased across the street. Ms. Buckner further stated that every day she saw these two drunk and fighting on Broadway Street, and that she had seen Luther hit the deceased and knock her to the ground. Walter Gregg, the deceased's son, testified that Luther had told him that "I killed your mother. . . ." Jack Luther took the stand and denied that he had made that statement or had ever fought with the deceased.

The jury returned a verdict finding defendant guilty of second-degree murder. Defendant appealed to this Court from a judgment imposing a sentence of life imprisonment.

Other facts pertinent to the decision of this case will be set forth in the opinion.

*Rufus L. Edmisten, Attorney General, by W. A. Raney, Jr., Special Deputy Attorney General, for the State.*

*Floyd D. Brock for defendant appellant.*

BRANCH, Chief Justice.

Defendant first assigns as error the trial court's ruling that defendant had the mental capacity to stand trial.

The trial court conducted a pretrial hearing on defense counsel's motion questioning defendant's capacity to proceed to trial. At this hearing, Dr. John D. Patton, a psychiatrist, testified for the defense that he examined defendant for a total of three hours on several different occasions. He concluded that defendant was mildly mentally retarded with an I.Q. of less than 60 and a markedly impaired memory. The witness also testified that in his opinion defendant was able to understand the nature and object of the proceedings against him. He concluded, however, that in his opinion defendant was unable to assist in his defense in a rational and reasonable manner. This opinion was based on defendant's ability to understand only simple words and on his limited memory.

The State presented on *voir dire* the testimony of Dr. James Groce, a psychiatrist, who stated that he had an opportunity to observe and examine defendant for about three weeks commencing on 17 November 1978 when defendant was admitted to Dorothea Dix Hospital. After conducting psychological tests and a series of interviews, Dr. Groce was of the opinion that while defendant suffered from mild mental retardation, he could nonetheless understand the nature and object of the proceedings against him and could assist his attorney in his defense. Dr. Groce further testified that he found defendant to have a limited vocabulary and an I.Q. of 59. Defendant had had problems with alcoholism in the past.

[1] At the conclusion of the hearing, the trial court made findings of fact and conclusions of law resolving the conflicting testimony. The court concluded that defendant was "able to assist in his defense in a rational and reasonable manner."

By this assignment defendant first contends that insufficient evidence was presented to support the court's conclusion of law that defendant could assist in his defense "in a rational and reasonable manner." Dr. Groce testified only that defendant "can assist his attorney in his defense," and defendant claims that this was insufficient to support the court's conclusion. We disagree. In

our opinion, Dr. Groce's statement was tantamount to stating that defendant could assist in his defense in a rational and reasonable manner.

"When the court, as here, conducts the inquiry without a jury, the court's findings of fact, if supported by evidence, are conclusive on appeal." *State v. Taylor,* 290 N.C. 220, 228, 226 S.E. 2d 23, 27 (1976). Here the evidence amply supports the judge's findings of fact.

**[2]**  Defendant also contends by this assignment that the trial court erred in failing to determine whether defendant was able to "cooperate with his counsel to the end that any available defense may be interposed." For this requirement he relies on the following langauge of *State v. Cooper,* 286 N.C. 549, 213 S.E. 2d 305 (1975):

> The test of a defendant's mental capacity to stand trial is whether he has, at the time of trial, the mental capacity to comprehend his position, to understand the nature and object of the proceedings against him, to conduct his defense in a rational manner, and to cooperate with his counsel to the end that any available defense may be interprosed. *State v. Jones,* 278 N.C. 259, 179 S.E. 2d 433; *State v. Propst,* 274 N.C. 62, 161 S.E. 2d 560; *State v. Sullivan,* 229 N.C. 251, 49 S.E. 2d 458; Strong, N. C. Index 2d, Criminal Law, § 29, 21 Am. Jur. 2d, Criminal Law, § 65.

*Id.* at 565-66, 213 S.E. 2d at 316.

G.S. 15A-1001(a) was enacted in 1973 providing in pertinent part:

> No person may be tried, convicted, sentenced, or punished for a crime when by reason of mental illness or defect he is unable to understand the nature and object of the proceedings against him, to comprehend his own situation in reference to the proceedings, or to assist in his defense in a rational or reasonable manner.

This statutory provision expresses a legislative intent to alter the existing case law governing the determination of whether a defendant is mentally incapable of proceeding to trial. In contrast to our former case law, the new statute clearly sets forth in the dis-

State v. Jenkins

junctive three tests of mental incapacity to proceed, and the failure to meet any one would suffice to bar criminal proceedings against a defendant. The statute does not, however, require the trial judge to make a specific finding that defendant is able "to cooperate with his counsel to the end that any available defense may be interposed," and the failure of Judge Mills to so find did not constitute error.

[3] In his second assignment of error, defendant contends that the trial court erred in ruling that defendant made a knowing, understanding and intelligent waiver of his right to counsel and in admitting into evidence his statement to police.

Again the trial court conducted a lengthy *voir dire* hearing to determine whether defendant had been fully informed of his constitutional rights and had knowingly and voluntarily waived his right to counsel before making the inculpatory statement to police. The testimony of Officer W. R. Anarino tended to show that when defendant was placed into custody at the Asheville Police Department, Officer Anarino read him his *Miranda* rights from a waiver form, going over it very slowly and carefully with defendant. While reading him his rights, Officer Anarino repeatedly asked defendant whether he understood them, and defendant replied that he understood and did not want a lawyer present while he talked with the officers. Defendant then placed his signature upon the document. He told the officers that he wanted to get this thing off his chest and be a Christian, because when he went to heaven he wanted to be able to see his mother and sister.

The State also offered the testimony of Dr. James Groce, who testified much as he had at the pretrial hearing concerning defendant's capacity to proceed. He also stated that in his opinion defendant could understand the *Miranda* waiver form used by the police, and that going over it slowly and asking defendant after each paragraph whether he understood it would increase his understanding.

On *voir dire* Dr. John Patton testified for defendant that he examined defendant on three occasions and found him to have an I.Q. of less than 60 and a grossly impaired memory capacity. Dr. Patton stated his opinion that a number of words in the *Miranda* warning would not have been in defendant's vocabulary. In his

opinion, defendant could not have had a clear understanding of the consequences of his decision to sign the statement after the warning had been read to him. Nor could defendant have made a knowing and intelligent waiver of his right to counsel.

Upon this conflicting evidence, the trial judge found that defendant was taken into custody on 25 October 1978 and told the police detectives that he wanted to make a statement; that defendant was read his constitutional rights from a prepared form, and defendant said that he understood each right as it was explained to him; that he did in fact understand his rights; that his statement was freely and voluntarily made without coercion by the officers and that he understood the consequences thereof; that the typewritten statement was an accurate representation of defendant's conversation with the officers, and defendant indicated that the statement was correct; and that it was given after a full and understanding waiver of his constitutional rights. The trial court concluded that although defendant was mildly retarded, he was able to appreciate the consequences of giving such a statement and to understand his constitutional rights, which were fully and adequately explained to him by the police officers. The court thereupon ruled that defendant's statement was admissible into evidence.

It is well settled in this jurisdiction that when a defendant challenges the admissibility of an in-custody confession, the trial judge must conduct a *voir dire* hearing to determine whether defendant has been informed of his constitutional rights and has knowingly and voluntarily waived his right to counsel before making the challenged admissions. When the *voir dire* evidence is conflicting, as here, the trial judge must weigh the credibility of the witnesses, resolve the crucial conflicts and make appropriate findings of fact. When supported by competent evidence, his findings are conclusive on appeal. *State v. Jenkins*, 292 N.C. 179, 232 S.E. 2d 648 (1977); *State v. Biggs*, 289 N.C. 522, 223 S.E. 2d 371 (1976); *State v. Smith*, 278 N.C. 36, 178 S.E. 2d 597, *cert. denied*, 403 U.S. 934 (1971).

In the instant case there was ample evidence to support the trial judge's findings of fact and conclusions of law that defendant knowingly and intelligently waived his right to counsel. Although the *voir dire* evidence regarding defendant's mental capacity to

make a knowing waiver was in conflict, the trial juge resolved the dispute and made the appropriate findings of fact. *State v. Biggs, supra.* A defendant's subnormal mental capacity is a factor to be considered, but such lack of intelligence, standing alone, does not render an in-custody statement incompetent if it is in all other respects voluntary and understandingly made. *State v. Thompson,* 287 N.C. 303, 214 S.E. 2d 742 (1975), *death sentence vacated,* 428 U.S. 908 (1976). Consequently, we hold that the trial judge properly overruled the motion to suppress defendant's inculpatory statement.

[4] By his third assignment of error, defendant contends that the court erred by admitting into evidence photographs identified as State's exhibit numbers 13, 14, 15 and 16. State's exhibits 13 and 14 are photographs of the victim's body from different angles which were taken at the scene of the crime. The State's exhibit 15 depicts a multilated portion of the victim's body, and State's exhibit 16 is a photograph of human flesh and hair found at the scene of the crime.

On *voir dire* and before the jury, S.B.I. Agent Elliott testified that these photographs were fair and accurate representations of the body of the victim and the human flesh and hair as he observed them at the crime scene. He further stated that the exhibits could be used to illustrate his testimony. Upon admitting the exhibits into evidence, the trial judge properly instructed that the exhibits were admitted for the sole purpose of illustrating the testimony of the witness.

The rule concerning the admission of similar exhibits was set forth in *State v. Atkinson,* 275 N.C. 288, 167 S.E. 2d 241 (1969), *rev'd on other grounds,* 403 U.S. 948 (1971), where Justice Lake speaking for the Court stated:

> The fact that a photograph depicts a horrible, gruesome and revolting scene, indicating a vicious, calculated act of cruelty, malice or lust, does not render the photograph incompetent in evidence, when properly authenticated as a correct portrayal of conditions observed by and related by the witness who uses the photograph to illustrate his testimony. *State v. Porth,* 269 N.C. 329, 153 S.E. 2d 10; *State v. Rogers,* 233 N.C. 390, 64 S.E. 2d 572, 28 A.L.R. 2d 1104; *State v. Gardner,* 228 N.C. 567, 46 S.E. 2d 824; Stansbury, North Carolina Evidence,

2d Ed., § 34. For a collection of authorities to the same effect from other jurisdictions, see Annot., 73 A.L.R. 2d 769.

"Ordinarily, photographs are competent to be used by a witness to explain or illustrate anything it is competent for him to describe in words." *State v. Gardner, supra.* The fact that the photographs are in color does not affect their admissibility. *State v. Hill,* 272 N.C. 439, 158 S.E. 2d 329; *People v. Moore,* 48 Cal. 2d 541, 310 P. 2d 969; *Commonwealth v. Makarewicz,* 333 Mass. 575, 132 N.E. 2d 294; Annot., *supra,* p. 811. Thus, in a prosecution for homicide, photographs showing the condition of the body when found, the location where found and the surrounding conditions at the time the body was found are not rendered incompetent by their portrayal of the gruesome spectacle and horrifying events which the witness testifies they accurately portray. *State v. Stanley,* 227 N.C. 650, 44 S.E. 2d 196; *State v. Cade,* 215 N.C. 393, 2 S.E. 2d 7.

*Id.* at 311, 167 S.E. 2d at 255.

Malice is an essential element of the crime of murder in the second degree, and the exhibits here offered were material and relevant as tending to show malice on the part of defendant. The photographs also tended to corroborate defendant's statement as to how blood came to be on his shirt. Further, the exhibits illustrated the testimony of the witness concerning the crime scene. We note that the State only offered four of twenty-nine similar photographs that were available and, therefore, did not violate the rule set out in *State v. Mercer,* 275 N.C. 108, 165 S.E. 2d 328 (1969), *overruled on other grounds in State v. Caddell,* 287 N.C. 266, 215 S.E. 2d 348 (1975), proscribing the introduction of an excessive number of gory photographs which add nothing in the way of probative value but tend solely to inflame the jurors.

This assignment of error is overruled.

Defendant next contends that the trial court erred in admitting into evidence a photograph of defendant for the purpose of illustrating the testimony of witness Bob Wally Creasman.

It is well settled in this jurisdiction that photographs are admissible to illustrate the testimony of a witness. "[W]here there is evidence of the accuracy of a photograph, a witness may use it for

the restricted purpose of explaining or illustrating to the jury his testimony relevant and material to some matter in controversy." *State v. Hatcher*, 277 N.C. 380, 388, 177 S.E. 2d 892, 898 (1970); *State v. Norris*, 242 N.C. 47, 86 S.E. 2d 916 (1955); *State v. Gardner*, 228 N.C. 567, 46 S.E. 2d 824 (1948); 1 Stansbury's North Carolina Evidence § 34 (Brandis rev. 1973).

Here the State's witness Grady Ward, a taxicab driver, testified that he drove defendant to the scene of the crime on the afternoon of 4 October 1978 and later returned him to the bus station. Defendant sought to impeach the witness' identification of defendant by cross-examining him about his prior statement that his passenger had blond hair. At the time of trial, defendant's hair was black.

The State then recalled Bob Wally Creasman and showed him a photograph which he identified as being of defendant. The following questioning then occurred:

> Q. Can you describe the color of his hair there in the photograph?
>
> MR. MILLER: Objection.
>
> THE COURT: Overruled.
>
> DEFENDANT'S EXCEPTION NO. 7
>
> A. Go ahead?
>
> Q. Yes sir.
>
> A. It is to me. It looks like the sun has bleached it out, sort of a reddish tint to me. It is a reddish blonde. I don't know. I can't—it is dark red where it has been bleached out to me.
>
> That's the way his hair appeared on October 4, 1978, and is a fair and accurate representation on my testimony as to how Richard Jenkins looked on October 4, 1978.

The photograph was subsequently received into evidence for the purpose of illustrating the testimony of the witness and for no other purpose.

Defendant contends that the initial question and answer set forth above were improper and rendered the subsequent founda-

tion testimony inadmissible. However, the witness had just testified that defendant had a reddish tint to his hair on October 4 while his hair was darker at trial, and the witness had identified the man in the photograph as defendant. It is clear that the photograph did in fact illustrate the witness' testimony and that the judge gave the proper limiting instruction.

The trial judge properly admitted defendant's photograph into evidence.

Defendant assigns as error the ruling of the trial judge admitting photographs of Mary Burdette and Jack Luther into evidence. He argues that these exhibits were not admissible because the respective witnesses who identified them did not testify that the photographs illustrated his or her testimony.

The witness Esta Ratcliff testified that she had known Mary Burdette for several years and that she could identify State's exhibit 17 as a photograph of Mary Burdette. The witness Otis Lee Mims stated that he knew Jack Luther and that he could identify State's exhibit 19 as a photograph of Jack Luther. When these exhibits were admitted into evidence over defendant's objection, the court gave a proper instruction limiting the use of the exhibits to illustrate the witnesses' testimony.

In our opinion, the testimony of each of these witnesses amounted to a statement that the photograph was an accurate representation of the person depicted. The relevancy of the photographs is illustrated by the use of exhibit 17 during the examination of the witness Wally Creasman, who identified that exhibit as being a photograph of the woman who left his taxi with defendant near the scene of the crime on the morning of 4 October 1978. Even had there been error in the admission of these exhibits, it is inconceivable that the admission of the photographs would have altered the result reached in this trial.

[5] We find no merit in defendant's argument that the trial judge erroneously admitted an S.B.I. laboratory analysis report. This report was an original document, and its authenticity was proved by the custodian of the records kept in the latent evidence section of the S.B.I. laboratory. Thus, the document was properly authenticated and was admissible into evidence. 1 Stansbury's North Carolina Evidence, *supra* at § 153. Even had the document

been erroneously admitted, defendant failed to show that he was prejudiced by the introduction of the record. To the contrary, the record was favorable to defendant in that it revealed that none of the fingerprints lifted at the scene of the crime matched defendant's fingerprints.

[6] Defendant next contends that the trial judge erred by failing *ex mero motu* to take some action when a defense witness was taken into custody by a deputy sheriff after the witness had testified.

It was stipulated that immediately after defense witness Ocel Haney left the witness stand, the chief investigator for the district attorney who was also a deputy sheriff took the witness into custody and placed him on the prisoners' bench. This occurred out of the presence of the jury and before court resumed, and Mr. Haney was discharged from custody before the jury returned to the courtroom.

The record discloses that defendant did not lodge an objection to this occurrence at trial. Neither did he move for a mistrial. Thus, this assignment presents no question for appellate review since it is not supported by an exception duly taken at trial. *State v. Roberts*, 293 N.C. 1, 235 S.E. 2d 203 (1977); *see* Rule 10(b)(1), N.C. R. App. Pro. Even had the assignment been properly presented, the action complained of occurred out of the presence of the jury. Defendant has failed to carry his burden of showing prejudice because of the court's inaction. G.S. 15A-1443.

[7] Defendant assigns as error the failure of the trial judge on his own motion to instruct the jury to disregard the district attorney's use of the word "confession" in referring to the statement made by defendant to police officers.

On three occasions, the district attorney characterized defendant's statement to the police officers as a confession.

On one occasion defendant interposed no objection. Since the question did not involve evidence precluded by reason of public policy, defendant waived his right to the objection and had no proper basis for appeal. *State v. Gurley*, 283 N.C. 541, 196 S.E. 2d 725 (1973).

On the two other occasions when the district attorney used the word "confession" in the same context, defendant objected

and the trial judge sustained the objections without giving any cautionary instruction. Defendant did not request such instruction or move to strike the answer. Neither did he request the court to clarify this matter in his charge to the jury.

A confession is an acknowledgment in express words by an accused of his guilt of the crime charged or of some essential part of it. *State v. Fox*, 277 N.C. 1, 175 S.E. 2d 561 (1970). Here the statement made by defendant did not amount to a clearcut acknowledgment of his guilt of the crime charged; however, it was extremely inculpatory in that it placed him at the scene of the crime in an intoxicated condition. It disclosed that he remembered putting his fingers around the neck of the deceased and that she was dead when he left her. He thereafter told another person that he thought he had killed the deceased.

We concede that the statement made by defendant might have been more appropriately called an inculpatory statement and that it would have been the better practice for the trial court to have accompanied his ruling with an instruction to the jury to disregard the challenged word. Nevertheless, other than the questioned characterization of defendant's statement, the questions to which objections were sustained did not place before the jury any incompetent or otherwise inadmissible evidence. Under these circumstances, we think it improbable that the district attorney's improper characterization of defendant's statement might have affected the outcome of this case. Our conclusion is buttressed by defendant's failure to move to strike or to request a cautionary or clarifying instruction at any stage of the trial.

Defendant next assigns as error the trial court's denial of his motions to dismiss.

A motion to dismiss tests the sufficiency of all the evidence to carry the case to the jury in the same manner as does a motion for nonsuit. *State v. Everhart*, 291 N.C. 700, 231 S.E. 2d 604 (1977). We stated the familiar rules governing consideration of evidence when a motion for judgment as of nonsuit is lodged in *State v. McKinney*, 288 N.C. 113, 215 S.E. 2d 578 (1975), as follows:

> A motion to nonsuit in a criminal case requires consideration of the evidence in the light most favorable to the

State, and the State is entitled to every reasonable intendment and every reasonable inference to be drawn therefrom. *State v. Cutler*, 271 N.C. 379, 156 S.E. 2d 679 (1967). Contraditions and discrepancies are for the jury to resolve and do not warrant nonsuit. *State v. Bolin*, 281 N.C. 415, 189 S.E. 2d 235 (1972); *State v. Greene*, 278 N.C. 649, 180 S.E. 2d 789 (1971). All of the evidence actually admitted, whether competent or incompetent, which is favorable to the State is considered by the Court in ruling upon the motion. *State v. Cutler, supra; State v. Walker*, 266 N.C. 269, 145 S.E. 2d 833 (1966). If there is substantial evidence — whether direct, circumstantial, or both — to support a finding that the offense charged has been committed and that defendant committed it, a case for the jury is made and nonsuit should be denied. *State v. Cook*, 273 N.C. 377, 160 S.E. 2d 49 (1968); *State v. Norggins*, 215 N.C. 220, 1 S.E. 2d 533 (1939).

*Id.* at 117, 215 S.E. 2d at 581-82.

[8]　We turn to the question of whether there was sufficient evidence to sustain defendant's conviction of the lesser included charge of murder in the second degree.

Murder in the second degree is the unlawful killing of a human being with malice but without premeditation and deliberation. *State v. Wilkerson*, 295 N.C. 559, 247 S.E. 2d 905 (1978). The requisite element of malice was aptly defined in *Wilkerson* in the following language:

"Malice has many definitions. To the layman it means hatred, ill will or malevolence toward a particular individual. To be sure, a person in such a state of mind or haboring such emotions has actual or particular malice. *State v. Benson*, 183 N.C. 795, 111 S.E. 869. In a legal sense, however, malice is not restricted to spite or enmity toward a particular person. It also denotes a wrongful act intentionally done without just cause or excuse; 'whatever is done "with a willful disregard of the rights of others, whether it be to compass some unlawful end, or some lawful end by unlawful means constitutes legal malice." ' *State v. Knotts*, 168 N.C. 173, 182-3, 83 S.E. 972, 976. It comprehends not only particular animosity 'but also wickedness of disposition, hardness of heart, cruelty, recklessness of consequences, and a mind regardless

of social duty and deliberately bent on mischief, though there may be no intention to injure a particular person.' 21 A. & E. 133 (2d Edition 1902). *Accord, State v. Long,* 117 N.C. 791, 798-9, 23 S.E. 431."

*Id.* at 578, 247 S.E. 2d at 916.

In the instant case the State presented evidence tending to show that around 11:00 a.m. on 4 October 1978, defendant left the B & R Bar in Asheville with the deceased, Mary Burdette. According to the testimony of John Ingle, a taxicab driver, they rode in a taxi to a point on Broadway Street where it intersects a little road leading through some woods into a grassy field.

Defendant's statement made to police officers tended to show that defendant and the deceased got out of the taxicab, walked up into the woods and started drinking. Defendant stated that they had sexual intercourse, and defendant went to sleep for about twenty minutes. When he awoke, the deceased was not breathing and her heart was not beating. Defendant had been drinking heavily and did not know whether he had killed her or not; although he had put his hands on her neck, he did not remember squeezing. Defendant walked to the bus station and bought a ticket to Knoxville, Tennessee. He then asked the ticket agent to call a taxicab for him, because he wanted to return to where he had left the deceased and make sure that she was dead. Once on Broadway Street, defendant told the taxi driver to go down the road and wait for him, while defendant walked to where the body lay. When her returned to the taxi, he had blood on his shirt. He told the driver that it was his night to get drunk. He rode back to the bus station where he took a bus to Knoxville, returning to Asheville on the following evening. Defendant also admitted that he told a friend on October 6 that on the day he met the deceased he was drinking "pretty bad." He said that he thought that he had killed her; he had grabbed her by the neck, and she was dead when he left her.

Grady Ward testified that on 4 October 1978 he was operating a taxi in Asheville. On that day at about 2:30 p.m. he picked defendant up at the bus station and drove him to a path near Broadway. Defendant told him to return in about twenty minutes. He complied, and when defendant returned, he had blood

on his shirt and remarked "the bitch was sick." The witness then carried defendant back to the bus station.

The State's evidence further tended to show that the nude body of the deceased was found on 11 October 1978 in a grassy clearing off Broadway Street. Items of clothing, assorted papers and a brown pocketbook were found near the body. Dr. Charles Bruce Alexander, a forensic pathologist, testified that the body was in an advanced stage of decomposition including the partial skeletonization of the head and neck. The jawbone had been recently fractured in two places, and there was evidence of trauma in the neck area and an incised wound in the genital area measuring approximately five by five and one-half inches. In the physician's opinion, the deceased received a tremendous blow or blows to the head and neck area and died from the resulting injury. Dr. Alexander was also of the opinion that the genital wound had probably been inflicted after death, due to the apparent lack of bleeding in that area.

Applying the above-stated principles of law to the evidence presented in this case, we are of the opinion that there was ample evidence from which the jury could reasonably find that the crime of second-degree murder had been committed and that the defendant was the perpetrator of that crime. We, therefore, hold that the trial judge correctly denied defendant's motions to dismiss.

By his assignments of error numbers 12 and 13, defendant challenges the admission of certain testimony during *voir dire* hearings. None of the challenged testimony was before the jury, and it is therefore presumed that if the evidence was incompetent, the trial judge would disregard it in making his findings. Therefore, defendant has failed to show how the admission of the testimony prejudiced him. *State v. Patterson*, 288 N.C. 553, 220 S.E. 2d 600 (1975), *death sentence vacated*, 428 U.S. 904 (1976).

We have carefully considered the entire record and find no error warranting a new trial.

No error.

Justice BROCK did not participate in the consideration or decision of this case.