STATE OF NORTH CAROLINA v. HAROLD WESLEY JONES, Defendant

No. COA01-1422

(Filed 15 October 2002)

**1. Confessions and Incriminating Statements— custodial interrogation—age—mental capacity**

    The trial court did not err by denying defendant sixteen-year-old's motion to suppress statements he made to law enforcement officers in an interview room at a police station detailing his involvement in the victim's death even though defendant contends his statements were the result of a custodial interrogation and were therefore inadmissible given his age and subnormal mental capacity, because: (1) defendant was not in custody when he understood that he was free to leave at any time, he made no incriminating statements at his first interview, and he demonstrated a marked level of familiarity with the criminal justice system; and (2) a reasonable person in defendant's position would not have believed himself to be in custody.

**2. Confessions and Incriminating Statements— voluntary and intelligent waiver—age—mental capacity**

    The trial court did not err by denying defendant sixteen-year-old's motion to suppress statements he made to law enforcement officers in an interview room at a police station detailing his involvement in the victim's death even though defendant contends he was incapable of voluntarily and intelligently waiving his rights based on his age and subnormal mental capacity, because: (1) the circumstances were not sufficient to render defendant's will overborne and his capacity for self-determination critically impaired; (2) the trial court was confronted with conflicting evidence concerning defendant's true mental capacity; and (3) there is no evidence indicating that defendant was in any way mistreated or coerced by the police.

Appeal by defendant from judgment entered 5 October 2000 by Judge E. Lynn Johnson in Cumberland County Superior Court. Heard in the Court of Appeals 9 September 2002.

*Attorney General Roy Cooper, by Special Deputy Attorney General Robert J. Blum, for the State.*

*David J. P. Barber for defendant-appellant.*

EAGLES, Chief Judge.

Defendant Harold Wesley Jones was indicted and tried on charges of first-degree murder, first-degree kidnapping, first-degree forcible rape, first-degree statutory rape, first-degree statutory sexual offense and two counts of first-degree forcible sexual offense for his role in the kidnapping, rape and murder of ten-year-old T.L. Defendant was convicted on all counts except first-degree statutory rape, for which the jury returned a verdict of not guilty.

The evidence tended to establish the following. At the time of the offense defendant was sixteen years old and had been living with his twenty-three-year-old sister Al-Nesia Jones and his thirteen-year-old nephew J. J. Defendant moved in with his sister following the death of his mother in 1997, leaving his father, who continued living in New Jersey. Until 29 September 1998, defendant lived in a rental house located at 614 Lakeside Avenue in Burlington, approximately one block away from the victim's home. However, on 16 October 1998, defendant was living on Morningside Drive in Burlington. Defendant's seventeen-year-old girlfriend, D. B., frequently visited defendant and occasionally lived with him and the other members of his family. Consequently, the defendant, D. B., and J. J. all knew the ten-year-old, female victim, T. L.

After school on 16 October 1998, defendant, D. B. and J. J. went to Elmira Park near Lakeside Avenue in Burlington. Defendant and D. B. watched from the Elmira Recreation Center while J. J. played football with some of his friends. At some point in the afternoon, the victim walked by the park and recreation center on her way home from a local convenience store. Defendant and D. B. followed the victim away from the park on foot, in the direction of Lakeside Avenue. J. J. left the park a short time later, also in the direction of Lakeside Avenue. J. J. caught up with the victim sometime thereafter and accompanied her to the house located at 614 Lakeside Avenue, which had been vacant and under repair since defendant and his family moved out.

STATE v. JONES

[153 N.C. App. 358 (2002)]

Once the defendant, the victim, J. J. and D. B. were all inside the house, J. J. began strangling the victim with a piece of coaxial television cable that he found in the house. D. B. directed defendant and J. J. to pull down the victim's pants. After J. J. did so, J. J. pushed the victim to the ground. D. B. then held the victim down while J. J. engaged in vaginal intercourse and defendant engaged in anal intercourse with the victim. Once this was over, D. B. and J. J. attempted to clean up the victim. When their efforts proved to be unsuccessful, defendant watched as J. J. and D. B. beat the victim about the head with a wooden bed rail that was found in the house. However, the victim did not die, so J. J. again wrapped the coaxial wire around the victim's neck and strangled her. Defendant then held the door while J. J. and D. B. dragged the victim's body out of the house by the coaxial cable wrapped around her neck. The victim was covered with a large piece of cloth and left between the fence and an oil drum in the back yard. She later died as a result of blunt force trauma to the head. In the days following discovery of the victim's body, the defendant, as well as J. J. and D. B. were all identified by police as suspects in the victim's death.

On 17 October 1998, two non-uniformed investigators with the Burlington Police Department went to defendant's home to see if he would agree to be interviewed. Al-Nesia Jones, D. B. and J. J. were also there. All three suspects were asked, in Al-Nesia's presence, if they would come to the police department to talk about T. L.'s death. Each was told they were not under arrest, did not have to go to the police department and were under no obligation to give any statements. Each agreed to talk with the officers and thereafter were driven by police to the Burlington Police Department. Defendant was directed into an interview room where he was interviewed separately from D. B. and J. J. by the two investigators who had driven them to the station. Before the interview began, the defendant was again told that he was not under arrest, was free to leave at any time and was under no obligation to speak. Defendant said he understood and agreed to talk to the officers. During the interview, defendant told police that he had not been back to 614 Lakeside Avenue since he moved approximately three weeks earlier. Defendant initially denied knowing the victim, however, he later admitted that he had met her once while living on Morningside Avenue. Defendant denied any involvement in the victim's death. The interview lasted approximately thirty to thirty-five minutes and defendant was taken home by police at the conclusion of the interview.

On 21 October 1998, police again sought to interview the defendant concerning T. L.'s death. This time, two different non-uniformed investigators went to defendant's school to see if he would come to the police department for another interview. Before going to the school, the investigators contacted the school resource officer assigned to defendant's school. This officer went to defendant's class and escorted defendant to the principal's office where he met with the investigators.

The investigators introduced themselves to defendant as members of the Burlington Police Department investigating the death of T. L. They told defendant that they wanted to interview him again and asked if he would be willing to come to the police department. The investigators told defendant that he was not under arrest and did not have to speak or go with them if he did not want to. Defendant was further told that if he came to the police department, he could leave at any time and the officers would see that he was driven home. Defendant said he understood and agreed to speak with the officers. Defendant rode in the front passenger seat of the investigators' car. Defendant was neither searched before he got in the car nor restrained once inside. The conversation on the way consisted mainly of general discussion about school and how long defendant had lived in Burlington. Defendant was not questioned about T. L.'s death on the way to the police department.

After arriving at the Burlington Police Department, the investigators escorted defendant to Lieutenant Jackie Sheffield's office. The office was of average size, carpeted, wall-papered and had four windows to the outside. The office was furnished comfortably with pictures and plants, as well as three extra office chairs arranged around a living-room type end table. Defendant went in and sat in one of the three chairs. The investigators followed, closing the door behind them and sitting in the remaining two chairs near the end table.

Once the investigators sat down, they produced a written *Miranda* waiver form and went over it with defendant, each line being read aloud by one of the investigators. Defendant also followed along on the page as the words were read to him. Reading the form verbatim, the investigators reintroduced themselves to defendant, told him the purpose for the interview, and gave defendant each of his *Miranda* warnings. In addition, defendant was also told that he had the right to have a parent or guardian present with him during questioning and that if he chose to answer questions without a guardian, he had the right to stop anytime he decided he wanted one present.

Following the reading of each individual right, the investigators paused and asked defendant if he understood or had any questions. Defendant indicated each time that he understood, both verbally and by initialing or writing "yes" on the page next to the clause that had just been read to him. The investigators then read the waiver portion of the document aloud to defendant and again asked defendant if he understood and wanted to answer their questions. Defendant said he did and so indicated by signing the waiver. Defendant was then asked if he needed anything to drink or a break to use the bathroom. After indicating that he did not, defendant was told that he could stop the interview anytime he needed to take a break. Defendant said he understood and the interview began.

Defendant's initial interview lasted approximately two hours. During most of this period, defendant denied any involvement in T. L.'s death. At the end of this period, however, defendant admitted that he was at 614 Lakeside Avenue the day T. L. was killed. Following this admission, the investigators took a break and again asked defendant if he needed to go to the bathroom or wanted anything to drink. Defendant declined. The investigators then left defendant alone in the office while they stepped out into the hallway. While the first two investigators were out of the room, a third plain-clothes investigator went into the office alone and asked defendant if he knew what happened to T. L. This time defendant said he did and gave an oral statement detailing his involvement in the victim's death. The first two investigators then came back into the office and memorialized defendant's statement in writing. Defendant made corrections on the written statement which he initialed and signed each page of the statement.

Defendant moved to suppress his statements, contending they were made involuntarily because he lacked the mental capacity to knowingly and understandingly waive his Constitutional rights. An evidentiary hearing was conducted on defendant's motion from 18 September 2000 to 21 September 2000. Defendant's evidence included testimony from Dr. John Warren, an expert in the field of clinical psychology with specialization in forensic and medical psychology. Dr. Warren testified that defendant suffered from fetal alcohol syndrome and was mentally retarded, with full scale I.Q. scores that ranged somewhere between 56 and 65. According to Dr. Warren, I.Q. scores between 100 and 90 were average; scores between 90 and 80 were low average; scores between 80 and 70 were borderline; and below 70 was the mentally retarded range.

Dr. George Baroff, an expert in clinical psychology with specialization in mental retardation, also testified for defendant. Dr. Baroff testified on cross-examination that the scores reflected in Dr. Warren's report did not coincide with the scores that appeared on the test administered to defendant. Dr. Baroff further testified that the results on the test indicated that defendant's full scale I.Q. score was 69, with scores of 72 on both the verbal and performance sub-tests. This placed defendant only one point below the threshold for mild mental retardation.

To further rebut defendant's assertion that he could not competently understand and waive his rights, the State presented the testimony of Art Dunn, a special education teacher at Western Youth Institute. Dunn testified that defendant performed satisfactorily on the reading comprehension assignments given to him while he was at Western Youth Institute. The State also presented testimony concerning two instances where defendant was previously questioned by police in matters unrelated to T. L.'s death. Finally, Deputies Hester Rastle and Jeffrey Svedek testified that while transporting prisoners including the defendant, they overheard defendant assure three other prisoners that jail officials "can't prove anything," during a conversation concerning charges pending against defendant and the other prisoners.

The trial court entered an order concluding there was no custodial interrogation and that the statements made by defendant on 21 October 1998 were given freely, voluntarily and knowingly. The trial court denied defendant's motion to suppress. At trial defendant was convicted of first-degree murder, first-degree kidnapping, first-degree forcible rape, first-degree statutory sexual offense and two counts of first-degree forcible sexual offense. Defendant appeals.

[1] Defendant argues that the trial court erred in denying his motion to suppress the statements he made to police. Specifically, defendant contends that his confession was the product of custodial interrogation and therefore inadmissible because given his age and mental capacity, he was incapable of voluntarily and intelligently waiving his Constitutional rights. After a careful review of the record and trial transcript, we disagree.

We begin by noting that "the standard of review in evaluating a trial court's ruling on a motion to suppress is that the trial court's findings of fact are conclusive on appeal if supported by competent evidence, even if the evidence is conflicting." *State v. Buchanan,* 353

N.C. 332, 336, 543 S.E.2d 823, 826 (2001). "However, the determination of whether a defendant was in custody, based on those findings of fact, is a question of law that is fully reviewable by this Court." *State v. Patterson*, 146 N.C. App. 113, 120, 552 S.E.2d 246, 253 (2001), *disc. review denied*, 354 N.C. 578, 559 S.E.2d 548 (2001). "[T]he trial court's conclusions . . . must be legally correct, reflecting a correct application of applicable legal principles to the facts found." *State v. Golphin*, 352 N.C. 364, 409, 533 S.E.2d 168, 201 (2000), *cert. denied*, 532 U.S. 931, 149 L. Ed. 2d 305 (2001).

Here, the trial court concluded that defendant was not in custody on 21 October 1998, based on the criteria set forth in *State v. Daughtry*, 340 N.C. 488, 459 S.E.2d 747 (1995), *cert. denied*, 516 U.S. 1079, 133 L. Ed. 2d 739 (1996), and *State v. Sanders*, 122 N.C. App. 691, 471 S.E.2d 641 (1996). Since these decisions reiterate the appropriate test for determining whether a person is "in custody," we conclude that the trial court applied the correct legal standard.

"[C]ustodial interrogation . . . mean[s] questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda v. Arizona*, 384 U.S. 436, 444, 16 L. Ed. 2d 694, 706 (1966). *See also, State v. Buchanan*, 353 N.C. 332, 337, 543 S.E.2d 823, 826 (2001). "[I]n determining whether a suspect is in custody, an appellate court must examine all the circumstances surrounding the interrogation; but the definitive inquiry is whether there was a formal arrest or a restraint on freedom of movement of the degree associated with a formal arrest." *Buchanan*, 353 N.C. at 338, 543 S.E.2d at 827. This involves " 'an objective test as to whether a reasonable person in the position of the defendant would believe himself to be in custody or that he had been deprived of his freedom of action in some significant way.' " *State v. Sanders*, 122 N.C. App. 691, 693, 471 S.E.2d 641, 642 (1996) (quoting *State v. Greene*, 332 N.C. 565, 577, 422 S.E.2d 730, 737 (1992)).

In *Sanders*, the defendant agreed to accompany detectives to the police station for an interview. The interview lasted approximately two hours and was conducted in an interview room by two detectives who were joined for a brief time by a third officer. Upon request, defendant was allowed to go to the bathroom and take a break and was never threatened or promised that he would not be prosecuted or obtain a lesser sentence by cooperating with police. *Sanders*, 122 N.C. App. at 694, 471 S.E.2d at 643. This Court held "that a reasonable

person in defendant's position would not have believed himself to be "in custody" for *Miranda* purposes." *Id.* (emphasis supplied).

Here, defendant attempts to distinguish *Sanders* on grounds that a sixteen-year-old, mentally retarded boy would have believed himself to be in custody the moment he was removed from his class and brought to the principal's office by a school officer.

> The test for determining whether the interrogation was custodial is 'whether a reasonable person in the suspect's position would believe that he had been taken into custody or otherwise deprived of his freedom of action in any significant way,' or whether the suspect felt free to leave. This is an objective test, based upon a reasonable person standard, and is 'to be applied on a case-by-case basis considering all the facts and circumstances.'

*State v. Hall*, 131 N.C. App. 427, 432, 508 S.E.2d 8, 12 (1998), *aff'd*, 350 N.C. 303, 513 S.E.2d 561 (1999) (citation omitted). *See also State v. Medlin*, 333 N.C. 280, 291, 426 S.E.2d 402, 407 (1993). The subjective belief of the defendant as to his freedom to leave is not in and of itself determinative. *Hall*, 131 N.C. App. at 432, 508 S.E.2d at 12. Instead, "we must examine the record as a whole and, applying the reasonable person standard set out above, determine as a matter of law whether [the] defendant was in custody." *Id.* Therefore, "the only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation." *Stansbury v. California*, 511 U.S. 318, 324, 128 L. Ed. 2d 293, 299 (1994).

Here, the trial court made detailed findings of fact with regard to the interview which took place on 21 October 1998. The trial court found that two plain-clothes Burlington police officers went to defendant's school and asked defendant if he would accompany them to the police department for an interview. Prior to this, the officers contacted another officer assigned to defendant's school and had defendant brought to the principal's office to meet them. The officers told defendant he was not under arrest and did not have to speak with them. Defendant was further told that if he did go with the officers, he could leave at any time and the officers would take him home if he needed them to. Defendant voluntarily accompanied the officers to the police department, where he was interviewed in a comfortably furnished office by two, unarmed, plain-clothes officers. Defendant was offered the use of the bathroom as well as given the opportunity for a break whenever he desired, both of which he declined. Defendant was fully advised of his rights, which he acknowledged

and waived in writing. Defendant was not shackled or handcuffed; no threats or promises were made; and no pressure was exerted upon defendant during the course of the interview. Defendant had three prior police contacts in 1998, one of which involved a similar interview by police on 17 October 1998.

Evidence elicited during the suppression hearing is also relevant to this inquiry. First, the interview of 17 October 1998 took place in an interview room, not an office. Defendant understood then that he was free to leave at any time and made no incriminating statements. Following the interview, defendant was allowed to leave the police station, just as he had been promised. Next, defendant demonstrated a marked level of familiarity with the criminal justice system, particularly principles of proof. Finally, defendant was left unattended in Lt. Sheffield's office while the interviewing officers took a break.

On the record before us, the trial court's findings are sufficient to support the conclusion that a reasonable person in defendant's position would not have believed himself to be in custody. Furthermore, these findings are amply supported by the evidentiary record. Accordingly, we conclude that defendant was not in custody when he gave the statements in question.

[2] Defendant next argues that he was incapable of effectively waiving his constitutional rights due to his age and sub-normal mental capacity. As a result, defendant contends his confession was inadmissible because it was not given voluntarily. Because we find that defendant was not in custody at the time he confessed, it is unnecessary for us to determine whether defendant properly waived his constitutional rights under *Miranda*. Even assuming *arguendo* that defendant was in custody, we conclude he effectively waived his rights.

In reaching this conclusion, we are guided by the decisions of our own Supreme Court:

> We have consistently held that a defendant's subnormal mental capacity is a factor to be considered when determining whether a knowing and intelligent waiver of rights has been made. Such lack of intelligence does not, however, standing alone, render an in-custody statement incompetent if it is in all other respects voluntarily and understandingly made.

> Although age is also to be considered by the trial judge in ruling upon the admissibility of a defendant's confession, the fact

that the defendant is youthful will not preclude the admission of his inculpatory statement absent mistreatment or coercion by the police officers.

*State v. Fincher*, 309 N.C. 1, 8, 305 S.E.2d 685, 690 (1983) (citation omitted). *Accord, State v. Jenkins*, 300 N.C. 578, 268 S.E.2d 458 (1980) (mildly retarded defendant with I.Q. of 60 capable of waiving rights under *Miranda*); *State v. Thompson*, 287 N.C. 303, 214 S.E.2d 742 (1975), *death sentence vacated*, 428 U.S. 908, 49 L. Ed. 2d 1213 (1976) (nineteen-year-old defendant with an I.Q. of 55 capable of waiving rights).

The test for voluntariness in North Carolina requires our review of the totality of the circumstances to determine if the confession is " 'the product of an essentially free and unconstrained choice by its maker.' " *State v. Hardy*, 339 N.C. 207, 222, 451 S.E.2d 600, 608 (1994) (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 225, 36 L. Ed. 2d 854, 862 (1973)).

> Factors to be considered in this inquiry are whether defendant was in custody, whether he was deceived, whether his Miranda rights were honored, whether he was held incommunicado, the length of the interrogation, whether there were physical threats or shows of violence, whether promises were made to obtain the confession, the familiarity of the declarant with the criminal justice system, and the mental condition of the declarant.

*Id. See also Schneckloth*, 412 U.S. at 226, 36 L. Ed. 2d at 862.

Applying these principles to the facts here, we conclude that the defendant's confession was voluntarily given. Defendant argues that the nature of the interrogation and the psychiatric testimony concerning his mental capabilities compel us to conclude that his confession was not voluntarily given. We disagree.

Here, the initial interview lasted approximately two hours. After a short break in the interview, the first two investigators left the room and a third investigator resumed the interview alone. We agree with the trial court that *State v. Sanders*, 122 N.C. App. 691, 471 S.E.2d 641 (1996), is instructive and weighs against a finding that the circumstances here were sufficient to render defendant's "will . . . overborne and his capacity for self-determination critically impaired." *Schneckloth*, 412 U.S. at 225-26, 36 L. Ed. 2d at 862.

Furthermore, the trial court was confronted with conflicting evidence concerning defendant's true mental capacity. One of defendant's own experts testified on cross-examination that defendant's actual full scale I.Q. score placed him only one point below the threshold for mental retardation. Moreover, defendant's verbal and performance test scores placed him two points above that threshold. "When the *voir dire* evidence is conflicting . . . the trial judge must weigh the credibility of the witnesses, resolve the crucial conflicts and make appropriate findings of fact. When supported by competent evidence, his findings are conclusive on appeal." *State v. Jenkins*, 300 N.C. 578, 584, 268 S.E.2d 458, 463 (1980). On this record, there is ample evidence to support the trial judge's findings of fact and conclusions of law that defendant knowingly and intelligently waived his rights.

Likewise, we find no evidence in the record before us that indicates defendant was in any way mistreated or coerced by the police. *State v. Fincher*, 309 N.C. 1, 305 S.E.2d 685 (1983), is instructive. In *Fincher*, the defendant argued that his consent to the search of his apartment was ineffective because it was not voluntarily and intelligently given. Our Supreme Court explained that the legal principles involved in determining the voluntariness of an inculpatory statement made by a mentally deficient defendant "are equally apposite to situations where the voluntariness of a consent to search is at issue." *Id.* 309 N.C. at 8, 305 S.E.2d at 690.

In *Fincher*, a seventeen-year-old defendant was arrested and handcuffed, read his *Miranda* warnings, and immediately taken from his apartment to a patrol car. The arresting officer presented defendant with a written consent to search form for his apartment and defendant agreed to sign the form in the presence of at least ten city police officers. During *voir dire*, defendant introduced psychiatric testimony that he was mentally retarded, suffered from a schizophreniform disorder and had an I.Q. of 50 although his verbal I.Q. was estimated to be 65. The *Fincher* Court concluded that defendant was capable of "giving a valid consent to search as a matter of law," *id.* 309 N.C. at 8, 305 S.E.2d at 690-91, and held that these facts supported the conclusion that defendant "voluntarily, willingly and understandingly consented to the search . . . ." *Id.* 309 N.C. at 9, 305 S.E.2d at 691.

In light of *Fincher*, nothing on the record before us indicates that defendant waived his rights as a result of mistreatment or coercion at the hands of the police. Accordingly, we hold that defendant was

capable of effectively waiving his constitutional rights and did so. Therefore, the trial court properly denied defendant's motion to suppress and the judgment of the trial court is affirmed.

Affirmed.

Judges MARTIN and HUNTER concur.