STATE OF NORTH CAROLINA v. MICHAEL EDWARD FINCHER AND TERRY JEROME WRIGHT

No. 453A82

(Filed 9 August 1983)

1. **Constitutional Law § 63; Jury § 7.11— exclusion of jurors for capital punishment views—cross-section of community**

    Defendant's Sixth Amendment right to select a jury from a cross-section of the community was not violated when the State was permitted to question prospective jurors regarding their death penalty views and the court excluded certain jurors for cause on the basis of those views.

2. **Searches and Seizures § 14— consent to search—youthful age and mental deficiency**

    A 17-year-old defendant with an I.Q. of between 50 and 65 was not incapable of giving a valid consent to search as a matter of law by virtue of his age and mental deficiency.

3. **Searches and Seizures § 14— lawfulness of consent to search**

    There was ample evidence of record to support the trial court's findings that defendant understood a consent to search form and that no force or coercion was used against him or any promises made to him to obtain his signature on the form, and those findings supported the trial court's conclusion that defendant voluntarily, willingly and understandingly consented to a search of his bedroom, notwithstanding defendant presented evidence that he was 17 years old at the time of the search, that he had an I.Q. of only 50 to 65, that he suffered from a schizophreniform disorder, that he was more susceptible to fear and intimidation than an average person, that ten police officers were present when he was arrested, and that officers told him that if he refused to sign the form, a warrant would be obtained and "either way we are going to search the apartment."

1

**4. Criminal Law § 75.16; Infants § 17— 17-year-old defendant—in-custody interrogation—right to warnings for juveniles**

   A 17-year-old defendant was entitled to receive the warnings required for juveniles by G.S. 7A-595(a) prior to his in-custody interrogation, and his in-custody statements were inadmissible in his murder, rape and burglary trial where he was not advised that he had a right to have a parent, guardian or custodian present during questioning. However, defendant was not prejudiced by the erroneous admission of his statements in light of the overwhelming evidence of his guilt where the State presented evidence that the crimes occurred on Halloween night; defendant was seen in the area of the victim's apartment on that night; defendant had in his possession that evening a Halloween mask which was later recovered from the scene of the crimes; defendant told a witness that he thought he had killed someone on Halloween night; a bloodstained coat recovered from defendant's bedroom was identified as the coat defendant was wearing on Halloween night; bloodstains on the coat were inconsistent with defendant's blood type; blood on the coat and blood found on the victim's blouse had a similar PGM reaction; fibers removed from the coat were microscropically consistent with fibers removed from a pillowcase found in the victim's apartment; and defendant's bloody handprint was found on a mattress cover on a bed in the victim's apartment. G.S. 15A-1443(a).

**5. Criminal Law § 75.11— interrogation of defendant—no invocation of right to remain silent**

   Defendant did not invoke his Fifth Amendment right to remain silent when he told officers that he did not wish to give any further written statements until he heard the truth from a codefendant where an officer attempted to ascertain whether defendant intended to invoke his Fifth Amendment right by inquiring as to whether he could ask another question, and defendant immediately and unhesitatingly answered affirmatively, thereby clarifying that his earlier statement was not an expression of an intent to preclude all further questions.

**6. Criminal Law § 75.3— statements by codefendant—no deception by officer—no taint on defendant's confession**

   Where defendant told officers that he would tell the truth if a codefendant would do so and that two people were involved in the crime, an officer's statement to the codefendant that defendant "was going to tell the truth about it" and that defendant said they were both involved was not deceptive or untruthful so as to render the codefendant's confession involuntary and a taint on defendant's subsequent confession.

**7. Criminal Law § 75.14— voluntary confession—youthfulness and mental retardation of defendant**

   Although defendant was youthful and had an I.Q. of only 73, the totality of the circumstances supported the trial judge's conclusions that defendant was capable of making an understanding waiver of his *Miranda* rights and that his confessions were made freely, voluntarily and understandingly.

---

State v. Fincher

---

8. **Burglary and Unlawful Breakings § 6.2— instruction on felony intended — error cured**

In a burglary case in which the trial court had instructed the jury that in order to convict a codefendant of first degree burglary, it must find that at the time of the breaking and entering the codefendant intended to commit the felony of *rape*, the trial court erred in incorporating such instruction by reference in the instructions as to defendant when the State's evidence related only to defendant's intent to commit the felony of *larceny*, but such error was cured by the court's further correct instruction and by the written verdict form which referred to an intent to commit felonious larceny.

Justice MARTIN concurring in result.

Justice EXUM concurring in part and dissenting in part.

Justice FRYE joins in this concurring and dissenting opinion.

APPEAL by defendants from *Sitton, Judge,* at the 9 March 1982 Criminal Session of MECKLENBURG County Superior Court.

Defendants Michael Fincher and Terry Wright were tried jointly upon bills of indictment charging each of them with the first-degree murder and first-degree rape of Henrietta Wallace, and the first-degree burglary of her home. These offenses were alleged to have been committed on Halloween night, 31 October 1981. Defendants entered pleas of not guilty to each of the offenses charged.

Given the nature of defendants' contentions, an extensive statement of the evidence presented at trial is unnecessary. Those facts pertinent to the issues presented will be hereinafter set forth in this opinion.

The jury found defendant Fincher guilty of first-degree murder on the theory of felony murder, first-degree rape and first-degree burglary. Defendant Wright was found guilty of first-degree burglary and not guilty of murder.[1]

The penalty phase of the trial continued as to defendant Fincher and the jury recommended that he be sentenced to life imprisonment for the first-degree murder of Ms. Wallace. Following a sentencing hearing, Fincher was sentenced to a consecutive term of 50 years on the first-degree burglary charge. Since the

---

1. The rape charge against defendant Wright was dismissed at the close of the State's evidence.

felony murder conviction was premised upon the commission of the rape, the rape conviction merged with the felony murder conviction and no sentence was imposed on the rape charge.

Defendant Wright was sentenced to 36 years on the first-degree burglary charge.

Defendant Fincher appealed the life sentence directly to this Court as a matter of right pursuant to G.S. 7A-27(a). Defendants' motions to bypass the Court of Appeals on the burglary charges and to consolidate the appeals in this Court were allowed 13 January 1983.

*Rufus L. Edmisten, Attorney General, by Isaac T. Avery, III, Special Deputy Attorney General, for the State.*

*Edward T. Hinson, Jr. and David M. Kern, for defendant-appellant Michael Edward Fincher.*

*Paul J. Williams for defendant-appellant Terry Jerome Wright.*

BRANCH, Chief Justice.

### Appeal of Fincher

[1] By his first assignment of error, defendant contends the trial court committed reversible error in permitting the State to question prospective jurors regarding their views on the death penalty and excluding for cause those who expressed opposition to it. Defendant argues that this process of "death qualifying" a jury eliminates from consideration for jury service an identifiable segment of the population, thereby violating his sixth amendment right to select a jury from a representative cross-section of the community.

Defendant concedes that this argument has been consistently rejected by this Court. *See State v. Ladd,* 308 N.C. 272, 302 S.E. 2d 164 (1983); *State v. Davis,* 305 N.C. 400, 290 S.E. 2d 574 (1982); *State v. Taylor,* 304 N.C. 249, 283 S.E. 2d 761 (1981), and *State v. Avery,* 299 N.C. 126, 261 S.E. 2d 803 (1980). He cites no new arguments in support of his position that these cases were wrongly decided. We hold that our prior decisions are sound and binding precedent and therefore dispositive of defendant's contention. This assignment is overruled.

We next consider defendant's contention that the trial judge erroneously admitted into evidence a blue coat taken from defendant's bedroom during a warrantless search of his apartment. The coat was identified at trial as the coat defendant Fincher was wearing on the night of Ms. Wallace's death. Jane Burton, a criminalist with the Charlotte-Mecklenburg Crime Laboratory, testified that she found human bloodstains on the coat which had a similar PGM activity to the blood found on the blouse Ms. Wallace was wearing on the night of the murder. According to Ms. Burton, the bloodstains on the coat were inconsistent with defendants' blood types and could not, therefore, have come from either Fincher or Wright. Dr. Louis Portis also identified the coat and testified that he compared fibers which were removed from the coat with fibers taken from a pillowcase found in Ms. Wallace's apartment. He concluded from this comparison that the fibers were microscopically consistent and that each had a similar dye color.

Upon defendant's motion to suppress this evidence, the trial judge found facts and concluded that the search of defendant's apartment was a valid consent search. He therefore ruled that the evidence obtained pursuant to the search was admissible into evidence.

Defendant argues that the search of his apartment was not based upon lawful consent because the totality of the circumstances surrounding his "consent" impels the conclusion that it was not voluntarily and intelligently given.

When the validity of a consent to search is challenged, the trial court must conduct a *voir dire* hearing to determine whether the consent was in fact given voluntarily and without compulsion. *State v. Vestal*, 278 N.C. 561, 180 S.E. 2d 755 (1971), *cert. denied*, 414 U.S. 874, 94 S.Ct. 157, 38 L.Ed. 2d 114 (1973). "[T]he question whether a consent to a search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances." *Schneckloth v. Bustamonte*, 412 U.S. 218, 227, 93 S.Ct. 2041, 2047-48, 36 L.Ed. 2d 854, 862-63 (1973); *accord, State v. Brown*, 306 N.C. 151, 293 S.E. 2d 569 (1982).

Here, the trial court conducted an extensive *voir dire* and heard testimony concerning the events surrounding the signing of

the consent form. The evidence at this evidentiary hearing revealed that defendant's consent to the search was acquired under the following circumstances:

Michael Fincher was arrested at his residence on Friday, 6 November 1981, at approximately 8:30 a.m. At least ten city police officers were then present. The arresting officer immediately advised Fincher of his *Miranda* rights. Fincher stated, in response to direct questions by Officer R. E. Sanders, that he understood the warnings and that he would answer police questions without a lawyer present. The officer did not, however, ask defendant any questions at that time. Defendant was permitted to get dressed and was handcuffed and taken from the apartment to a patrol car.

Officer James Alsbrooks prepared a consent to search form for the apartment. He first discussed the form with Luvenia Montgomery, defendant's mother. After determining that defendant's grandmother, Amanda Johnson, was in fact the lessee of the duplex apartment, Officer Alsbrooks approached Ms. Johnson and asked if she would permit the officers to conduct a search of the residence. Alsbrooks read the consent form to Ms. Johnson and she was afforded an opportunity to examine it. She agreed to permit the search and, according to Officer Alsbrooks, signed the consent form. Ms. Johnson did not remember signing the document, although she admitted that it looked like her signature on the form.

Officer W. D. Starnes then read the consent form to defendant and spoke with him about signing it. Defendant asked the police officers whether his mother had given permission for the officers to search the house. The officers replied that defendant's mother had given her permission but that only defendant could consent to the search of his room. In fact, it was defendant's grandmother who had signed the consent form granting permission to the police officers to search the apartment.

Defendant agreed to sign the consent form but when it was presented to him he stated that he did not understand it. When asked what he did not understand about the form, defendant responded that he wanted to know what would happen if he did not sign it. Fincher was told that although he did not have to give permission to search, if he refused the officers would obtain a

search warrant and conduct a search of his bedroom. Sergeant Starnes said, "Either way, we are going to search the apartment." Defendant thereafter stated that he understood and signed the consent to search form.

Defendant presented psychiatric testimony which tended to show that he is mentally retarded and suffers from a schizophreniform disorder. Dr. Jim Groce, a psychiatrist for the State of North Carolina, testified that Fincher's mental illness causes a disturbance of defendant's mood and behavior, sometimes to the extent that defendant suffers from auditory hallucinations. Dr. Groce testified that if defendant was hallucinating at a particular point in time he might talk to himself and would perhaps respond nonsensically to questions posited to him. The arresting officers testified, however, that defendant was coherent and cooperative and that he responsively answered all questions they asked him.

Further testimony of Dr. Groce indicated that defendant's mental and emotional condition would make him somewhat more susceptible to fear in a given situation than an average individual. Dr. Edwin Harris agreed that Fincher is easily influenced by emotion and that his ability to deal with stress is limited. In response to questioning by the district attorney on *voir dire*, however, Dr. Groce stated that, in his opinion, defendant was capable of telling the police officers that he did not understand the warnings.

Dr. Groce determined defendant's I.Q. to be 50, although Dr. Edwin Harris estimated that defendant has a verbal I.Q. of 65. Dr. Harris testified that, in his opinion, Fincher is functionally illiterate and could not have understood the consent to search form that he signed. Tests performed on defendant at Dorothea Dix Hospital revealed that he reads on a level between second and third grade. Dr. Barbara Edwards, an expert in reading and reading education, stated that an individual would have to read on a tenth grade level or comprehend on an eighth grade level in order to understand the waiver forms. Both she and Dr. Groce stated, however, that repetition, explanations and prior experience could affect the test results and enable an individual to better understand and comprehend.

Defendant bases his argument that the consent to search was not voluntarily and understandingly given primarily on the psychiatric testimony outlined above. He contends that his mental ill-

ness, coupled with the circumstances surrounding his arrest, created a situation that frightened and intimidated him to the extent that he was incapable of giving a voluntary and knowing consent to search.

While most of our cases involving a mentally deficient defendant have been concerned with the voluntariness of an inculpatory statement made during custodial interrogation, the controlling legal principles are equally apposite to situations where the voluntariness of a consent to search is at issue. *See Schneckloth v. Bustamonte*, 412 U.S. 218, 223-27, 93 S.Ct. 2041, 2045-47, 36 L.Ed. 2d 854, 860-62 (1973).

We have consistently held that a defendant's subnormal mental capacity is a factor to be considered when determining whether a knowing and intelligent waiver of rights has been made. *See State v. Jenkins*, 300 N.C. 578, 268 S.E. 2d 458 (1980); *State v. Thompson*, 287 N.C. 303, 214 S.E. 2d 742 (1975), *death sentence vacated*, 428 U.S. 908, 96 S.Ct. 3215, 49 L.Ed. 2d 1213 (1976). Such lack of intelligence does not, however, standing alone, render an in-custody statement incompetent if it is in all other respects voluntary and understandingly made. *State v. Jenkins* at 585, 268 S.E. 2d at 463; *State v. Thompson* at 318, 214 S.E. 2d at 752.

Although age is also to be considered by the trial judge in ruling upon the admissibility of a defendant's confession, the fact that the defendant is youthful will not preclude the admission of his inculpatory statement absent mistreatment or coercion by the police officers. *State v. Thompson, supra; State v. Penley*, 284 N.C. 247, 200 S.E. 2d 1 (1973); *State v. Lynch*, 279 N.C. 1, 181 S.E. 2d 561 (1971).

[2] In *State v. Thompson, supra*, we held that a 19-year-old defendant with an I.Q. of 55 was capable of waiving his rights. Thus, we conclude that defendant is not incapable of giving a valid consent to search as a matter of law by virtue of his age and mental deficiency.

Following *voir dire*, Judge Sitton found facts consistent with the evidence presented and specifically found:

1. That on November 6th and 7th, 1981, both defendants appeared to be alert, coherent, were not under the influence

of alcohol or narcotic drugs; that neither defendant was threatened, nor were they promised or offered any reward or inducements by the law enforcement officers to make a statement or to sign the waivers herein.

2. That no threats or suggested violence or show of violence of law enforcement officers to persuade or induce the defendants to waive their rights and make statements existed.

. . . .

7. That the defendant Fincher understood the questions in regard to the non-testimonial form and consent to search form.

[3] Despite the testimony cited by defendant as indicative of his lack of intelligence and comprehensive ability, there is ample evidence of record to support the trial judge's findings that defendant understood the form and that no force or coercion was used against him or any promises made to him. These findings are therefore binding upon this Court. *State v. Rook*, 304 N.C. 201, 283 S.E. 2d 732 (1981), *cert. denied*, 455 U.S. 1038, 102 S.Ct. 1741, 72 L.Ed. 2d 155 (1982); *State v. Pruitt*, 286 N.C. 442, 212 S.E. 2d 92 (1975). In turn, these findings support the legal conclusion that defendant voluntarily, willingly and understandingly consented to the search of his bedroom. We hold that the trial court correctly ruled that the blue coat seized pursuant to the search was admissible.

Defendant also assigns as error the denial of his motion to suppress and the admission into evidence of statements given by him to police officers on 6 and 7 November 1981. Defendant contends that the admission of these statements violated his fifth amendment right to be free from self-incrimination, his sixth amendment right to counsel and his right to be advised as a juvenile in accordance with G.S. 7A-595.

[4] We do not reach the constitutional issues raised because we find error in the failure to properly advise defendant as a juvenile pursuant to G.S.7A-595.

G.S. 7A-517(20) defines a juvenile as "[a]ny person who has not reached his eighteenth birthday and is not married, emancipated, or a member of the armed services. . . ." It is un-

disputed that defendant Fincher was seventeen years old at the time he committed the offenses charged and at the time he was interrogated by police officers on 6 and 7 November 1981. He therefore is a juvenile within the statutory definition of that term.

G.S. 7A-595(a) provides that:

Any *juvenile* in custody must be advised prior to questioning:

(1) That he has a right to remain silent; and

(2) That any statement he does make can be and may be used against him; and

(3) That he has a right to have a parent, guardian or custodian present during questioning; and

(4) That he has a right to consult with an attorney and that one will be appointed for him if he is not represented and wants representation.

(Emphasis added.) The uncontroverted evidence reveals that defendant was never advised of the third warning, that is, that he was entitled to have a parent, guardian or custodian present during questioning.

The trial judge recognized this omission but determined that defendant was not entitled to the statutory protections enumerated in G.S. 7A-595. He concluded as a matter of law "[t]hat the defendant Fincher was not, within the meaning of the law, a minor or a juvenile, requiring any special treatment; but, that he may be treated within the law of the State as an adult."

Although the basis for the trial court's ruling is not entirely clear, the State argues that since "G.S. 7A-517(12) defines a delinquent juvenile for purposes of juvenile court jurisdiction as anyone who has not yet reached his sixteenth birthday," and since Fincher was seventeen years old and "over the age of being a juvenile delinquent," G.S. 7A-595 does not apply.

This position is simply unsupportable. G.S. 7A-517(12) reads:

*Delinquent Juvenile.* — Any juvenile less than 16 years of age who has committed a criminal offense under State law or

under an ordinance of local government, including violation of the motor vehicle laws.

Contrary to the State's contention, this statute does not define the age limitations of juvenile court jurisdiction. The word jurisdiction does not even appear in the statute, nor is there a reference to other jurisdictional provisions of the Juvenile Code. Furthermore, whether defendant is a juvenile delinquent is, in our opinion, irrelevant to a consideration of whether he is entitled to the protections of G.S. 7A-595.

The definitional section of the North Carolina Juvenile Code, G.S. 7A-517, is prefaced by the following language: "Unless the context *clearly* requires otherwise, the following words have the listed meanings . . . ." (emphasis added). As previously stated, juvenile is defined in subdivision (20) of G.S. 7A-517 as "[a]ny person who has not reached his eighteenth birthday," with a few exceptions not here applicable. We conclude that the term juvenile as it is used in G.S. 7A-595 must be given this "listed meaning" for the context does not require, nor even suggest, a different interpretation. We therefore hold that, as a juvenile, defendant was entitled to receive all of the warnings set forth in G.S. 7A-595.

We further hold, on the basis of G.S. 7A-595(d), that it was error for the trial judge to admit the 6 and 7 November statements into evidence in light of the fact that defendant was not properly advised.

G.S. 7A-595(d) provides that:

(d) Before admitting any statement resulting from custodial interrogation into evidence, the judge must find that the juvenile knowingly, willingly, and understandingly waived his rights.

Since the record reflects that defendant was not informed of his right to have a parent, guardian or custodian present during questioning, there can be no finding that defendant Fincher "knowingly, willingly, and understandingly waived" this privilege. In the absence of such a finding, it was error for the trial judge to admit the challenged statements.

We now turn to the question of whether defendant was prejudiced by the erroneous admission of this evidence.

The failure to advise defendant of his right to have a parent, custodian or guardian present during questioning is not an error of constitutional magnitude because this privilege is statutory in origin and does not emanate from the Constitution. Therefore, we apply the standard set forth in G.S. 15A-1443(a) to determine whether the erroneous admission into evidence of defendant's statements to police officers is sufficient to warrant a new trial. G.S. 15A-1443(a) provides, in part, as follows:

A defendant is prejudiced by errors relating to rights other than under the Constitution of the United States when there is a reasonable possibility that, had the error in question not been committed, a different result would have been reached at the trial out of which the appeal arises. The burden of showing such prejudice under this subsection is upon the defendant.

We conclude that in light of the overwhelming evidence of defendant's guilt, there is not a reasonable possibility that had defendant's in-custody statements not been admitted, a different result would have been reached at trial.

Several persons testified that they saw defendant in the area of the victim's apartment on Halloween night. Tony Camp and Billy Charles Wright stated that defendant had in his possession that evening a Halloween mask which was later recovered from the scene of the crime. Camp further testified that defendant told him that he thought he had killed someone on Halloween night.

There was also substantial physical evidence which tended to place defendant at the scene of the crime on the night of Ms. Wallace's murder. A bloodstained coat recovered from defendant's bedroom during the search of his apartment was identified as the coat Fincher was wearing on Halloween night. Jane Burton testified that the blood on the coat and blood found on Ms. Wallace's blouse had a similar PGM reaction. She further stated that the bloodstains on the coat were inconsistent with defendants' blood types.

Dr. Louis Portis also testified regarding physical evidence obtained from defendant's coat. He testified that he compared fibers removed from the coat with those removed from a pillowcase found in the victim's apartment. It was his opinion that the fibers were microscopically consistent.

Finally, the State introduced the critical testimony of Kathleen Ramseur, an expert in fingerprint identification and comparison. She testified that she compared the characteristics of a bloody handprint recovered from a plastic mattress cover on a bed in the victim's apartment with Michael Fincher's prints. It was her opinion that the bloody print found in Ms. Wallace's bedroom was that of defendant Fincher.

Although we do not decide the question of whether defendant's constitutional rights were violated by the admission into evidence of his inculpatory statements to police officers, we are satisfied that even if such constitutional error was committed, the substantial evidence of defendant's guilt is sufficient to render such error harmless beyond a reasonable doubt. G.S. 15A-1443(b).

## Appeal of Wright

By his first assignment of error, defendant Wright contends the trial court erred in denying his motion to suppress and admitting into evidence inculpatory statements given by him to police officers on 6 and 7 November 1981.

Upon defendant's motion to suppress, the trial judge conducted an extensive *voir dire*. At the close of this evidentiary hearing, Judge Sitton found facts and concluded that "none of [defendant's] constitutional rights, either Federal or State, . . . were violated by [his] arrest, detention, interrogation or confessions." Defendant's motion to suppress was therefore denied and the 6 and 7 November statements were admitted into evidence.

The *voir dire* testimony revealed the following regarding the circumstances surrounding defendant's arrest and interrogation:

On 5 November 1981, Terry Wright was arrested for a probation violation unrelated to this case and was booked into the Mecklenburg County jail. At about 6:00 p.m. the following day, Officer R. D. Sanders brought Wright to the Law Enforcement Center for the purpose of questioning him regarding his involvement in the Wallace murder.

Officer Sanders testified that defendant was advised of his *Miranda* rights. Defendant was afforded an opportunity to read the waiver of rights form. According to Officer Sanders, Wright took about five minutes to read the form, "going over it with his

finger." Defendant stated that he understood the warnings and signed the waiver of rights form.

Officer Sanders then questioned defendant about the Halloween incident. Wright inquired as to whether Michael Fincher had given a statement to police officers. After Sanders responded that he had, Wright said "he would rather not say anything regarding that until he had a chance to read Michael Fincher's statement."

Officer Sanders then retrieved Fincher's statement and read it aloud to defendant. Defendant asked to read it and he was permitted to do so. Sanders testified that defendant took his finger and read from left to right under each line through all the pages.

After he went over the statement, Wright said he did not see his name and inquired as to what Fincher said he had done. Officer Sanders told defendant that he only knew that Fincher said he was involved. Following this exchange, defendant agreed to make an oral statement and, with Wright's permission, Officer Sanders wrote it down.

Officer Sanders told defendant that he didn't believe the statement. Defendant admitted he had not told the truth and stated that Fincher's statement was also untrue. Sanders asked for another written statement and defendant said he would give "a written statement when Michael Fincher tells him, face-to-face, about what happened." At that point, Officer Sanders ceased questioning and took Terry Wright back to jail.

At about 11:00 the next morning, 7 November, Officers Mullis and Sanders brought defendant to the police station for further interrogation. Defendant was again advised of his constitutional rights. Officer Mullis asked defendant to read aloud blocks 1, 2, 3 and 4 of the waiver form. Mullis testified that defendant read the requested paragraphs, stated that he understood the warnings and signed the waiver form.

Officer Sanders then asked Wright if he would give a written statement. Wright reiterated that he would only give a written statement when he heard the truth from Michael Fincher. Officer Sanders asked defendant if he could ask him one more question and Wright said yes. Sanders asked, "How many people were involved Halloween night?" Wright said, "Two."

Sanders then went to where Fincher was being interrogated and informed Officer S. C. Cook that Wright had said that only two were involved. Officer Cook then informed defendant Fincher that Wright would tell the truth if he did. He also told Fincher that Wright said they were both involved. Fincher then said that he might as well tell the truth and offered a confession.

After the police obtained Fincher's statement, they took him to the room where Wright was being interrogated. In the presence of Wright, Fincher related the events as they occurred on Halloween night. After Fincher was taken out of the room, Sanders asked Wright if Fincher had told the truth. Wright stated that he had and agreed to give a truthful written statement outlining his involvement in the Wallace murder.

[5] Defendant first contends the 7 November confession was inadmissible because it was obtained in violation of his fifth amendment right to be free from self-incrimination. He takes the position that he invoked his right to remain silent when he told the police officers that he did not wish to give any further written statements until he heard the truth from Michael Fincher. He argues that Officer Sanders did not scrupulously honor his right to cut off questioning because he asked the "one more question" which triggered the ensuing confessions of Fincher and Wright.

We reject this contention for we are of the opinion that defendant did not invoke his fifth amendment right to remain silent. Defendant twice stated that he did not want to give another *written* statement until after Fincher told the truth. From the cold record, we would not interpret this statement as indicating a desire that all questioning cease. It seems clear to us that defendant merely refused to give another formal statement indicating his involvement in the crime. This is far different from a request for the complete cessation of questioning regarding any aspect of the case.

We will concede, however, that defendant's statement might have been uttered with such intonation that it could reasonably have been interpreted as an expression of a desire to remain silent. The statement is, however, ambiguous in any context for it seems to merely condition the giving of a formal written statement.

In *Nash v. Estelle*, 597 F. 2d 513 (5th Cir.), *cert. denied*, 444 U.S. 981, 100 S.Ct. 485, 62 L.Ed. 2d 409 (1979), the Fifth Circuit Court of Appeals held that where a suspect's desires are expressed in an equivocal fashion, it is permissible for the questioning official to make further inquiry to clarify the suspect's wishes. The court explained the rationale for this holding as follows:

> While the suspect has an absolute right to terminate stationhouse interrogation, he also has the prerogative to then and there answer questions, if that be his choice. Some persons are moved by the desire to unburden themselves to confessing their crimes to police, while others want to make their own assessment of what to say to their custodians. "[A] blanket prohibition against the taking of voluntary statements or a permanent immunity from further interrogation, regardless of the circumstances, would transform the *Miranda* safeguards into wholly irrational obstacles to legitimate police activity, and deprive suspects of an opportunity to make informed and intelligent assessments of their interests." *Michigan v. Mosley*, 423 U.S. 96, 102, 96 S.Ct. 321, 326, 46 L.Ed. 2d 313 (1975). When, as in the case at bar, a desire for immediate talk clearly appears from the suspect's words and conduct, but he also states he wants a lawyer (i.e., "I would like to have a lawyer, but I would rather talk to you"), it is sound and fully constitutional police practice to clarify the course the suspect elects to choose.
>
> . . . .
>
> The critical factor is whether a review of the whole event discloses that the interviewing agent has impinged on the exercise of the suspect's option to cut off the interview.

597 F. 2d at 517-18. *See also United States v. Riggs*, 537 F. 2d 1219 (4th Cir. 1976).

Here, it is abundantly clear that Officer Sanders indicated at all times a willingness to respect defendant's constitutional privileges should he have chosen to exercise them. The record discloses that Officer Sanders attempted to ascertain whether defendant was intending to invoke his fifth amendment right by *inquiring* as to whether he could ask another question. Defendant immediately and unhesitatingly answered affirmatively, thereby

clarifying that his earlier statement was not an expression of an intent to preclude all further questioning.

We hold that defendant did not invoke his fifth amendment right to remain silent when he stated that he would not give another written statement until Fincher confronted him with the truth. Defendant's assertion that his right to cut off questioning was not scrupulously honored is without merit.

[6] Defendant next asserts that his fifth amendment rights were violated because his 7 November confession was precipitated by an illegal confession by Fincher. Wright contends that Fincher's statement was involuntary because it was made only in response to a lie by Officer Cook as to what defendant had said earlier to police officers.[2] Defendant appears to argue that since his inculpatory statement was occasioned by Fincher's, this primary illegality tainted his statement and rendered it inadmissible at trial.

As stated earlier, the record reveals that a few minutes before Officer Cook spoke to defendant Fincher, Wright told police officers that he would tell the truth if Fincher would truthfully relate what happened. Wright also informed the officers that two people were involved in the perpetration of the crime.

Initially, we note that the record is contradictory on the point of *exactly* what Officer Cook related to Michael Fincher. Officer Jones testified that Officer Cook related to Fincher precisely what Terry Wright actually stated. Officer Cook testified that he told Fincher that Wright said they were both involved and that Wright was going to tell the truth.

The trial judge did not resolve this conflict in the evidence by making a specific finding of fact on this point. We are of the opinion that his failure to do so was entirely reasonable. This is so because we are convinced that even if Officer Cook did not repeat Wright's words *verbatim*, he communicated the essence of these statements to Fincher. Saying that "Terry . . . was going

2. Defendant Fincher also raised this issue in his brief before this Court. Because of our disposition of Fincher's appeal on non-constitutional grounds, however, it was unnecessary to address this question in that appeal.

to tell the truth about it" is not à deceitful perversion of Wright's statement that he would tell the truth if Fincher did. Furthermore, when Wright stated that two were involved, it is obvious from the context that Wright was speaking of Fincher and himself. He had just stated that he would tell the truth if Fincher did; the clear import of this statement being that the two of them were the individuals involved. Also, at that point, each of them had already given statements admitting participation in the crime.

Construed contextually, we are of the opinion that Officer Cook's statement to Fincher was not deceptive or untruthful. Officer Cook in fact related to Fincher essentially what Wright had earlier stated. Fincher's 7 November confession was therefore not involuntarily given because it was offered in response to Officer Cook's information regarding Wright's statements. Consequently, defendant's argument that his confession was tainted by Fincher's "induced" confession must fail.

[7] Defendant's final argument with respect to the admissibility of his confessions is that there is insufficient evidence to support the trial judge's finding that defendant knowingly and understandingly waived his *Miranda* rights. Defendant relies primarily upon his youth and subnormal intellectual capacity to support his position that he was incapable of adequately understanding his constitutional rights.

Dr. John Wheeler was qualified as an expert in psychological evaluation and testing and testified on *voir dire* as to defendant's mental capabilities. At the request of defendant's attorney, Dr. Wheeler observed, tested and evaluated Wright on three separate occasions, spending a total of four and one-half hours with him. Dr. Wheeler was permitted to give his opinions concerning defendant's capacity to read, write, understand, reason and function, based on his observations, testing and school records. Dr. Wheeler testified that defendant scored very poorly on all tests, placing in the first or second percentile on each of them. He estimated defendant's I.Q. to be 73.

Dr. Wheeler was asked to evaluate the level of reading required to read and understand the waiver of rights form which the officers used to advise Terry Wright. It was his opinion that one would "at least need to be able to read and comprehend at

the sixth grade, minimum, sixth grade level; to be absolutely confident, more like seventh or eighth grade level, to understand this document." It was further Dr. Wheeler's opinion that defendant could not have read the waiver form and understood it in less than five minutes. Although the officers could easily have read it to him in less than 30 seconds, it was Dr. Wheeler's opinion that defendant could not have understood the consequences and implications of the concepts in the form.

Dr. Wheeler testified that during one of his sessions with defendant, he read the Surgeon General's warning as to the hazards of cigarette smoking to him. It was Dr. Wheeler's opinion that Wright understood the implications of this warning.

Finally, in his analysis of defendant's personality test, Dr. Wheeler stated that the test "did not suggest that he has a significant serious psychological disorder." However, it was Dr. Wheeler's opinion that defendant was a "follower"; that he would be conscious of avoiding the possibility that others would not like him and might therefore say that he understood something even though he did not.

As stated earlier in our discussion of defendant Fincher's appeal, the fact that a defendant is youthful and mentally retarded does not compel a determination that he did not knowingly and intelligently waive his *Miranda* rights. *State v. Thompson*, 287 N.C. 303, 214 S.E. 2d 742 (1975), *death sentence vacated*, 428 U.S. 908, 96 S.Ct. 3215, 49 L.Ed. 2d 1213 (1976). In such cases, however, "the record must be carefully scrutinized, with particular attention to both the characteristics of the accused and the details of the interrogation." *State v. Spence*, 36 N.C. App. 627, 629, 244 S.E. 2d 442, 443, *disc. rev. denied*, 295 N.C. 556, 248 S.E. 2d 734 (1978). The admissibility of the confession must be decided by viewing the totality of the circumstances. *State v. Jackson*, 308 N.C. 549, 304 S.E. 2d 134 (1983).

Guided by these principles, we are of the opinion that the totality of the circumstances support the trial judge's conclusion that defendant Wright was capable of making an understanding waiver of his constitutional rights.

The trial judge's findings of fact reflect the following:

Defendant was carefully advised of his *Miranda* rights on more than one occasion and each time unhesitatingly responded that he understood them. At the request of Officer Mullis, defendant read aloud numbered paragraphs 1, 2, 3 and 4 of the waiver of rights form. At one point during the officers' explanation of the warnings, defendant indicated by a facial expression that he did not understand the meaning of the word "leniency." Officer R. E. Sanders then explained the meaning of the word to defendant.

After he gave the first statement to police officers on 6 November, defendant declined to give another written statement until Michael Fincher confronted him with the truth. Defendant *twice* repeated this condition and steadfastly refused to give a written statement until his conditions were satisfied. This is, of course, some indication that defendant was aware of his right to control the timing and subject matter of police questioning and that he was not unduly intimidated by the officers.

The trial judge also found that defendant had prior experience with the criminal justice system, having been arrested and advised of his rights by Officer R. L. Quick on 26 March 1981. This is an important consideration in determining whether an inculpatory statement was made voluntarily and understandingly. *See State v. Jackson*, 308 N.C. 549, 304 S.E. 2d 134 (1983); *State v. Dawson*, 278 N.C. 351, 362, 180 S.E. 2d 140, 147 (1971).

Finally, the trial judge specifically found:

1. That on November 6th and 7th, 1981, both defendants appeared to be alert, coherent, were not under the influence of alcohol or narcotic drugs; that neither defendant was threatened, nor were they promised or offered any reward or inducements by the law enforcement officers to make a statement or to sign the waivers herein.

2. That no threats or suggested violence or show of violence of law enforcement officers to persuade or induce the defendants to waive their rights and make statements existed.

. . .

5. That the answers of the defendants were responsive and were reasonable to the questions asked of each.

These findings are amply supported by the *voir dire* testimony and are therefore binding upon this Court. *State v. Rook*, 304 N.C. 201, 283 S.E. 2d 732 (1981), *cert. denied*, 455 U.S. 1038, 102 S.Ct. 1741, 72 L.Ed. 2d 155 (1982); *State v. White*, 291 N.C. 118, 229 S.E. 2d 152 (1976). These facts, in turn, support the conclusion that defendant Wright's confessions were made freely, voluntarily and understandingly.

After a careful review of the entire record, we hold that the trial judge correctly admitted the inculpatory statements made by defendant on 6 and 7 November 1981.

[8] By his final assignment of error, defendant contends the trial judge committed prejudicial error during his burglary charge to the jury by making a confusing and erroneous comparison to the burglary charge previously given as to defendant Fincher.

When the trial judge instructed the jury on the elements of first-degree burglary as to Michael Fincher, he itemized the seven elements the State was required to prove beyond a reasonable doubt. Defendant directs our attention to that portion of the charge wherein Judge Sitton instructed on the sixth element.

> Sixth, that at the time of the breaking and entering, the defendant intended to commit the felony of rape or larceny.
>
> The Court instructs you that rape is the having [of] vaginal intercourse by force and against the will of the victim, when the perpetrator inflicts serious, personal, bodily injury.

STRIKE THE PORTION ABOUT WHAT I SAID "OR LARCENY."

At this point, the trial judge had informed the jury that in order to convict Fincher of first-degree burglary, they were required to find that at the time of the breaking and entering he intended to commit the felony of *rape*.

When the trial judge began to give the elements of burglary as to defendant Wright, he stated:

> I have previously stated to you the seven things, in — as to the defendant Michael Fincher, as to the crime, that the State must prove, beyond a reasonable doubt. I will not repeat those seven things, at this time. But, they apply here the same as previously given in my instructions.

Obviously, this "incorporation by reference" of the elements necessary to convict Wright of first-degree burglary was erroneous, since the only evidence presented by the State related to defendant Wright's intent to commit the felony of *larceny.*

However, immediately following this erroneous instruction, Judge Sitton gave an accurate charge in his final mandate to the jury as follows:

> So, I charge that if you find, from the evidence, beyond a reasonable doubt, that on or about October 31, 1981, the defendant, Terry Wright, acting either by himself or acting together with Michael Fincher; and, in a common scheme or purpose — plan or purpose to commit the burglary; and, Terry Wright went through a doorway, pushed open by another, and ran or walked into Henrietta Wallace's apartment dwelling, without her consent, in the night-time, *intending at that time to commit the felony of larceny;* and, that he took therefrom, the pocketbook, knowing at the time that he was not entitled to take it, intending at the time to deprive her of its use permanently; and, that Henrietta Wallace was in the house when he broke and entered, it would be your duty to return a verdict of "Guilty of burglary in the first degree" as to the defendant, Terry Wright. (Emphasis ours.)

We are of the opinion that the trial court's earlier misstatement was rectified by this correct instruction and that any misunderstanding or confusion that might have been caused by the error was removed. "Where . . . the inadvertence complained of occurs early in the charge but is not called to the attention of the court at the time, and is later corrected, the occurrence will not be held for prejudicial error when it is apparent from the record that the jury could not have been misled." *State v. Wells,* 290 N.C. 485, 498, 226 S.E. 2d 325, 334 (1976).

As further evidence that the jury could not have been misled by this error, we note that the written verdict form also clarified the jury instructions. The relevant portion reads:

> 1. Guilty of first degree burglary (felonious larceny).

> ANSWER: Guilty

This verdict form would clearly have indicated to the jurors that they could find defendant Wright guilty of first-degree burglary on the theory that at the time of the breaking and entering he intended to commit the felony of *larceny*.

For these reasons, we find the trial judge's misstatement wholly lacking in prejudicial effect. This assignment of error is overruled.

For the reasons set forth in this opinion, we hold that defendants Michael Edward Fincher and Terry Jerome Wright received a fair trial free of prejudicial error.

No error.

Justice MARTIN concurring in result.

Although I concur in the result reached by the majority, I dissent from the holding that N.C.G.S. 7A-595(a)(3) (1981) is applicable to defendant Fincher. This statute applies only to juvenile delinquency proceedings. I find no case in which this statute has been applied to *criminal* proceedings. *In re Horne*, 50 N.C. App. 97, 272 S.E. 2d 905 (1980), discussed the waiver of a juvenile's rights under the statute in a *juvenile* proceeding.

In effect, the majority seeks to engraft an additional requirement upon officers before interrogating persons under the age of eighteen by requiring that they be advised that they have a right to have a parent or guardian present during questioning. This result is reached by reasoning that the statute defines a juvenile as one who has not reached his eighteenth birthday; defendant is only seventeen years old, so he is entitled to the benefit of the statute.

While it is true that the statute defines a juvenile as one who has not reached his eighteenth birthday, the same subsection defines a juvenile for the purposes of being a juvenile delinquent as being one who has not reached his sixteenth birthday. N.C.G.S. 7A-595(a)(3) only applies to persons who are juveniles subject to a juvenile delinquency proceeding. N.C.G.S. 7A-517, the definitional section of the North Carolina Juvenile Code, states that the defined terms have the listed meanings "[u]nless the context clearly requires otherwise"; the word "juvenile" in N.C.G.S. 7A-595 clear-

ly means delinquent juvenile, as N.C.G.S. 7A-595 falls under Article 48, Law-Enforcement Procedures in Delinquency Proceedings. A person cannot be the subject of a juvenile delinquency proceeding if the act complained of occurred after the person reached his sixteenth birthday. N.C. Gen. Stat. § 7A-524 (1981). Where a person has been adjudged a juvenile delinquent and commits a criminal offense after reaching the age of sixteen, he must be prosecuted as an adult on that offense, even though he is still under the jurisdiction of the district court. *Id.* Likewise, if any other person over the age of sixteen and under the age of eighteen commits a criminal offense, he must be tried as an adult for that offense.

In short, this defendant, being over the age of sixteen, could not be subjected to a juvenile delinquency proceeding. N.C.G.S. 7A-595, a part of Article 48, "Law-Enforcement Procedures in Delinquency Proceedings," is applicable only to juvenile delinquency proceedings, not criminal prosecutions. A delinquency proceeding is not a criminal prosecution. *In re Burrus*, 275 N.C. 517, 169 S.E. 2d 879 (1969), *aff'd*, 403 U.S. 528, 29 L.Ed. 2d 647 (1971). The case at bar is a criminal prosecution.

It may seem that if a person is entitled to have a parent present in a delinquency proceeding, he should be so entitled in the more serious situation of a criminal prosecution. But there are cogent reasons to have a parent present in a delinquency proceeding: the family is involved, the juvenile may be taken from the home, the principal interest to be served is to rehabilitate the juvenile and save him from a life of crime. The court must consider the welfare of the juvenile as well as the best interests of the state. *In re Hardy*, 39 N.C. App. 610, 251 S.E. 2d 643 (1979). The state has a *greater* duty to protect the rights of a respondent in a juvenile proceeding than in a criminal prosecution. *In re Meyers*, 25 N.C. App. 555, 214 S.E. 2d 268 (1975). For this reason, the right to have a parent present is appropriate.

To the contrary, however, in criminal prosecutions a person over the age of sixteen and under the age of eighteen is treated as an adult. Family considerations are not so relevant or important, the interests of the victim and society in general must be considered. Here, all defendants are to be accorded the same rights. If the legislature had intended that persons under the

age of eighteen should be given additional rights in criminal prosecutions, it would have expressed that intent in Chapter 15A of the General Statutes. This the legislature can still do.

For these reasons, I respectfully dissent from what I perceive to be an unwarranted extension of the juvenile delinquency statute to criminal prosecutions. I concur in the well-reasoned remainder of the majority opinion.

Justice EXUM dissenting in part and concurring in part.

I concur with the majority's conclusion that Fincher's confession was inadmissible. In my view, however, Fincher's blue coat was unlawfully seized from his bedroom on the morning of his arrest and should not have been admitted into evidence against him. The majority assumes, and I agree, that only Fincher could have consented to the search of his bedroom. Applying the totality of circumstances test, I am satisfied that all the evidence demonstrates as a matter of law that Fincher was coerced into signing the consent form. Fincher was surrounded in his home by at least ten police officers. He told the police he did not understand the form they asked him to sign. The form was not explained. Fincher was not advised that he had a right not to consent and to insist that a warrant be obtained. Instead, the officers told him if he refused to sign, a warrant would be obtained and "either way, we are going to search the apartment." These actions, coupled with the uncontradicted evidence of Fincher's mental retardation, functional illiteracy, mental illness, and unusual susceptibility to fear and intimidation, compel me to conclude that Fincher was coerced. "Where there is coercion there cannot be consent." *Bumper v. North Carolina*, 391 U.S. 543, 550 (1968).

Neither can I conclude that the admission of both the coat and Fincher's confession were harmless error. Therefore, I think Fincher is entitled to a new trial.

With regard to Wright's appeal, the questions whether Wright unconditionally asserted his right to remain silent and, if so, whether the officers honored the assertion are close. After careful study, I conclude the majority has dealt with these issues correctly. I likewise concur in the majority's treatment of the

jury instruction question. I concur, therefore, in the majority's conclusion that no reversible error was committed as to Wright.

Justice FRYE joins in this dissenting and concurring opinion.